**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **MARSHALL ADAWAY,** | |
| Plaintiff, | |
| v. | Civil Action No. 7:13-CV-142 (HL) |
| **PATRICK ATWATER, JR., in his official capacity as Superintendent; TIFT COUNTY SCHOOLS, TIFT COUNTY SCHOOL BOARD; KIM EZEKIAL, in her official capacity as Board Member; JOHN W. SMITH, in his official capacity as Board Member; KIM RUTLAND, in her official capacity as Board Member; RITA GRIFFIN, in her official capacity as Board Member; MARIAN RICHBOURG, in her official capacity as Board Member; MELANIE ROBERSON, in her official capacity as Board Member; GANNON HALL, in his official capacity as Board Member,** | |
| Defendants. | |

**ORDER**

Plaintiff Marshall Adaway, an African American man over the age of 40, brings this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and under the Age Discrimination in Employment Act ("ADEA"), seeking redress for his alleged unlawful termination from his employment with the Tift County School District. Now before the Court is

Defendants' Motion for Summary Judgment. (Doc. 28). After reviewing the pleadings, briefs, depositions, and other evidentiary materials presented, and determining that there is no genuine dispute of the material facts, the Court finds that Defendants are entitled to judgment as a matter of law and grants Defendants' motion.

## I.   FACTUAL BACKGROUND

Plaintiff Marshall Adaway began working for the Tift County School District ("TCSD" or "School District")[1] sometime in the early 1990s.[2] (DSOMF ¶ 2).[3] Prior to the 2012-2013 school year, Plaintiff held two positions with the TCSD, one as a school bus driver and the other as a physical education paraprofessional at

---

[1] Throughout the briefing of this motion for summary judgment, the parties refer to Plaintiff's employer as either the Tift County School Board or the Tift County Board of Education. However, as discussed in more detail below, it is clear that Plaintiff was employed by the School District and not the School Board.

[2] It appears from the record that Plaintiff's employment with the TCSD was not continuous. (Doc. 38, pp. 21-27). At some point, he was terminated from his bus driving position and did not return to those job duties for approximately five years. (Doc. 38, p. 22). He continued to work as a paraprofessional for the remainder of the school year following his termination as a bus driver. (Doc. 38, p. 24). He then transferred to a paraprofessional position at another school, where he remained for a year before being terminated. (Doc. 38, pp. 24-25). He was not rehired as a paraprofessional for another three years. (Doc. 38, pp. 25-26). The termination from both jobs stemmed from an alleged DUI arrest, though the specifics of the arrest and the timing of this sequence of events is not evident from the record.

[3] "DSOMF" refers to Defendants' Statement of Material Facts. The cited paragraphs are those admitted by Plaintiff. "PSOMF" refers to Plaintiff's Statement of Material Facts. The cited paragraphs are those admitted by Defendant.

Northside Primary School. (Doc. 38, p. 32-33). Approximately one to two weeks before the start of the Fall 2012 term, Kevin Dobard, Executive Director of Human Resources and Professional Learning, contacted Plaintiff to inform him that he was being transferred to the in-school suspension ("ISS") classroom at the Northeast Campus of Tift County High School ("Northeast).[4] (PSOMF ¶ 1; Doc. 38, pp. 33-34). A vacancy opened in the ISS classroom when the previous paraprofessional earned his teaching certificate and accepted a teaching position. (DSOMF ¶ 57).[5] Dobard stated to Plaintiff, "They needed like new blood in that classroom over there." (Doc. 38, p. 34).

---

[4] Due to budget cuts, many paraprofessional positions in the school district were eliminated. (DSOMF ¶ 56). The physical education paraprofessional position at Northside Primary School was not filled after Plaintiff's transfer. (Doc. 28-7, p. 3).

[5] In response to this particular statement of fact asserted by Defendants, and frequently throughout his responses to Defendants' Statement of Material Facts, Plaintiff states that he "does not have knowledge of the facts . . . and can neither admit nor dispute the facts contained therein." (Doc. 34, ¶ 53). The local rules of this Court make clear that "[t]he respondent to a motion for summary judgment may not assert insufficient knowledge to admit or deny a material fact asserted by the movant unless the respondent has complied with the provisions of Rule 56(d) of the Federal Rules of Civil Procedure." M.D.Ga. L.R. 56; see also Dowdell v. Dolgencorp, LLC, 2014 WL 1315559, at *1 n.1 (M.D.Ga. March. 28, 2014). Because Plaintiff has not shown by affidavit or declaration that for some specified reason he cannot present facts to justify either his opposition or lack of knowledge in compliance with Federal Rule of Civil Procedure Rule 56(d), the Court deems admitted those supported facts presented by Defendants and uncontroverted by Plaintiff.

During Plaintiff's conversation with Dobard regarding the transfer, a question arose about whether Plaintiff could continue his bus route. (Doc. 38, pp. 34-35). The ISS position was a full-time position, and there was some concern about whether Plaintiff's bus route would conflict with his paraprofessional duties. (Doc. 38, p. 35). However, Plaintiff's morning bus route ended at Northeast, which meant that Plaintiff could report directly from one job to the next. (DSOMF ¶ 60). Plaintiff sought and obtained the permission of Northeast's Principal Scott Haskins to work as both a bus driver and the ISS paraprofessional, with the understanding that Plaintiff would begin his paraprofessional duties at the end of his morning bus route. (DSOMF ¶¶ 65-66; PSOMF ¶ 2).

In the years prior to transferring to Northeast, Plaintiff was permitted to return to his home to tend to his farm after his morning bus route and before the start of his paraprofessional responsibilities. (PSOMF ¶ 4; Doc. 38, p. 39). As a general rule, the School District allows bus drivers to drive their buses home at the end of their morning routes and at the end of their afternoon routes. (DSOMF ¶ 63). However, before the commencement of the 2012-2013 school year, Dobard instructed Plaintiff not to drive home between his two jobs. (DSOMF ¶¶ 62, 64). Plaintiff complied with this directive for a period of time but then reverted back to driving home between jobs. (DSOMF ¶ 67). While Plaintiff contends that his supervisor in the transportation department approved him returning to his

farm after his morning route (Doc. 38, pp. 45-46), there is no evidence that Plaintiff consulted with either Dobard, who originally gave the directive to cease this behavior, or Principal Haskins. (DSOMF ¶¶ 66-67).

As the ISS paraprofessional, Plaintiff had no teaching responsibilities. (Doc. 38, pp. 99-100; Doc. 42). Rather, his role was to maintain control of the classroom and to ensure that the students remained seated and engaged in their work assignments. (DSOMF ¶ 18; PSOMF ¶ 8). However, Plaintiff, like all employees of the TCSD, received a copy of the Employee Handbook each year, and was aware of the expected standards of conduct for all School District personnel. (DSOMF ¶¶ 4-9). Plaintiff also attended a training session conducted by Principal Haskins before the start of the 2012-2013 school year, during which Haskins thoroughly reviewed the standards of conduct and school policies. (DSOMF ¶¶ 10-13). Those standards include a mandate that all educators maintain a professional relationship with students both in and outside the classroom and further explain that it is a violation of the school district's ethical code to solicit, encourage, or consummate an inappropriate electronic relationship with any student. (DSOMF ¶¶ 14-15).

Sometime in the beginning of the Fall 2012 semester, Plaintiff discovered that students had been drawing obscene images on the walls of the ISS classroom. (Doc. 38, pp. 73, 76, 84-85). Plaintiff discussed the drawings with the

students and explained to "them that this was kind of like a subliminal thing." (Doc. 38, p. 73). Plaintiff then gathered the students around his desk and conducted an internet search for "subliminal messages." (DSOMF ¶ 22; PSOMF ¶ 15; Doc. 38, pp. 75, 77, 94). The search produced a blog containing a one minute and 18-second long video during which a man describes subliminal messages purportedly embedded within several Walt Disney animated movies. (Doc. 38, pp. 73-74). The images themselves were sexual in nature and included a depiction of two women in bikinis and the word "sex" written in the clouds from two different scenes in *The Lion King*. (Doc. 38, pp. 74, 81, 95-96). Another image taken from *The Little Mermaid* contained what appears to be a dildo. (Doc. 38, pp. 88, 95).

On another occasion, Plaintiff addressed the music listened to by the students. (Doc. 38, p. 79, 91, 94-96). Plaintiff explained that certain tracks when played in reverse contain subliminal messages. (Doc. 38, pp. 79, 91). To illustrate the point, Plaintiff played rap artist Jay-Z's "The Black Album", which contains lyrics such as "Murder, murder Jesus" and claims that Jay-Z is the head of the Illuminati. (Doc. 38, pp. 91-92, 95-96).

Plaintiff, who admits that his job as the ISS paraprofessional essentially was to maintain order and not to provide instruction of any sort (DSOMF ¶ 18; PSOMF ¶ 8; Doc. 38, pp. 99-100; Doc. 42), was, nevertheless, under the

impression that he could conduct such lessons on subliminal messages without prior approval from the school's administrators. (Doc. 38, pp. 76, 99). At his deposition, Plaintiff testified that during the training conducted by Principal Haskins preceding the start of the school year, Haskins, "told us if something comes up during the course of a class and that you don't have to have it approved, you have it in there, you make sure it is for the benefit and the teaching of the class." (Doc. 38, p. 76). Plaintiff understood that, "if you have something that's as [sic] of a sexual content, it must be for a teaching purpose. . . . That's why I would never do this if it wasn't something that I was instructed that it was okay to do." (Doc. 38, p. 99).

Pamela Morrow, another paraprofessional at Northeast who relieved Plaintiff from time to time during his lunch breaks or if he needed to leave work early, witnessed Plaintiff's sessions on subliminal messages. (DSOMF ¶¶ 20-21, Doc. 28-14).[6] Morrow attests that she saw Plaintiff "showing the students some pictures on the computer that were cartoons with human male and female private body parts." (Doc. 28-14, p. 2). The next day, she observed Plaintiff playing rap music in reverse. (Doc. 28-14, p. 2). Morrow reported the incidents to Dr. Lashonda Flanders, the Assistant Principal. (DSOMF ¶ 23).

---

[6] Plaintiff denies having a discussion with Morrow about the particular images he shared with the ISS students but does not otherwise dispute that she witnessed the incident. (Doc. 34, ¶ 17; Doc. 38, pp. 93-94).

Upon receiving Morrow's report of Plaintiff exhibiting allegedly inappropriate content from the internet to students, Dr. Flanders informed Principal Haskins. (DSOMF ¶¶ 23-24). Principal Haskins in turn addressed the allegations with Dobard, who conferred with Superintendent Patrick Atwater, Jr. about how to proceed. (DSOMF ¶¶ 25-26). Atwater instructed Dobard to place Plaintiff on administrative leave with pay and to launch an investigation. (DSOMF ¶ 27). Dr. Flanders then collected written statements from Morrow and two students who were present during Plaintiff's subliminal message presentations, Maya Burks and Jared Hillman. (DSOMF ¶¶ 31-34).

Principal Haskins promptly placed Plaintiff on administrative leave with pay as instructed. (DSOMF ¶¶ 28, 30; PSOMF ¶ 9; Doc. 38, p. 70). Haskins provided no explanation, simply stating to Plaintiff, "Mr. Dobard said for you to go home." (Doc. 38, p. 70). Plaintiff drove his bus for a day before being told by the supervisor of the transportation department that he was suspended from those duties as well. (Doc. 38, p. 71-72).

Several weeks later, after having an opportunity to review the witness statements, Dobard called Plaintiff to his office to discuss the matter. (DSOMF ¶ 37; PSOMF ¶¶ 10-11). Dobard inquired about the content of the material Plaintiff exhibited to the ISS class. (DSOMF ¶ 38; PSOMF ¶ 12; Doc. 38, pp. 72-73, 78-79). Plaintiff admitted to sharing information about subliminal messages with the

students and pulled up the particular website he exhibited to the students. (DSOMF ¶¶ 39-40; PSOMF ¶¶ 12, 16). Plaintiff explained to Dobard that he discussed the images with the students because they were drawing on the walls, and Plaintiff wanted to impress upon them that they were sending subliminal messages to other students. (PSOMF ¶ 13; Doc. 38, p. 73).

Dobard relayed his conversation with Plaintiff to Superintendent Atwater. (DSOMF ¶ 47). Atwater opined that he had no choice but to recommend Plaintiff for termination for showing sexual images to the students. (DSOMF ¶ 47). Dobard accordingly scheduled a second meeting with Plaintiff. (PSOMF ¶ 18). Dobard explained that Plaintiff either could resign or be recommended for termination. (PSOMF ¶ 22). Plaintiff stated, "I haven't did anything wrong," shook Dobard's hand, and left. (Doc. 38, p. 101). Plaintiff's bus driving position was not addressed at either meeting with Dobard. (Doc. 38, pp. 101-02).

At the December 2012 Tift County School Board meeting, the Board members met in closed, executive session to discuss the proposed termination of Plaintiff. (DSOMF ¶ 48). The Board members agreed that the images Plaintiff displayed to the students were sexual in nature and inappropriate. (DSOMF ¶ 48). Superintendent Atwater recommended Plaintiff's termination for this reason. (DSOMF ¶ 48). However, as a secondary issue, the Board members took up the matter of Plaintiff's daily routine of returning to his farm after his morning bus

route, despite being told to report directly to his paraprofessional duties. (DSOMF ¶ 49; PSOMF ¶ 25). The Board members then returned to open session and voted unanimously to accept Superintendent Atwater's recommendation that Plaintiff be terminated. (DSOMF ¶ 50). Plaintiff was terminated by the TCSD effective December 12, 2012. (DSOMF ¶ 1).

Following Plaintiff's termination, his ISS paraprofessional duties were assumed by a 29-year old African American man, who had been employed by the TCSD as a paraprofessional at another school in the district since 2011. (DSOMF ¶ 52; PSOMF ¶ 28; Doc. 28-7, p. 7). Plaintiff's bus driving position was filled by a 28-year old African American female. (DSOMF ¶ 53; Doc. 28-7, p. 7).

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must evaluate all of the evidence, together with any logical inferences, in the light most

10

favorable to the nonmoving party. Id. at 254-55. The court may not, however, make credibility determinations or weigh the evidence. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of a material fact." Celotex, 477 U.S. at 323 (internal quotation omitted). If the movant meets this burden, the burden shifts to the party opposing summary judgment to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the movant is not entitled to judgment as a matter of law. Id. at 324-26. This evidence must consist of more than conclusory allegations. See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991). In sum, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## III.   DISCUSSION

Plaintiff asserts claims for race and age discrimination against Defendants Tift County Schools, the Tift County School Board, the Superintendent of the

11

School Board, and each Board member in his or her official capacity. Plaintiff, who worked for the School District in a dual capacity as a school bus driver and as a paraprofessional, alleges that his employer treated him differently than other similarly situated employees and that the School District's proffered reasons for terminating him are mere pretext for both race and age discrimination.

Preliminarily, Defendants argue that Plaintiff misidentified the School District and, therefore, that the TCSD should be dismissed from this action based on Plaintiff's failure to timely correct the misnomer. Defendants further contend that the Tift County School Board should be dismissed as an entity lacking the capacity to be sued, and that Plaintiff's official capacity claims asserted against the individual Board members should be dismissed as redundant. Notwithstanding the proper identification of the Defendants necessary for the prosecution of this action, Defendants maintain that based on the undisputed material facts, Plaintiff cannot sustain his claims of alleged race discrimination in violation of Title VII and age discrimination in contravention of the ADEA.

### A.    Misidentification of Defendant

Defendants move the Court to dismiss Defendant Tift County Schools as an improper party to this case. Defendants point out that Plaintiff's Complaint (Doc. 1) names as a Defendant "Tift County Schools." In the twelfth defense raised in their Answer (Doc. 12), Defendants assert that "Tift County Schools" is

12

a non-entity. Rather, the legal designation for the school system is the "Tift County School District." Despite being placed on notice of the misnomer, Plaintiff neglected to amend his complaint to reflect the correct name of this Defendant. Defendants now ask the Court to dismiss the incorrectly identified entity based on Plaintiff's failure to accurately name the proper party.

While Plaintiff was on notice of the mistake and should have taken steps to cure the defect, the Court does not find the technical misidentification of the school system to be a fatal flaw. See Dockens v. DeKalb Cty. School System, 2008 WL 9396388, at *3 (N.D.Ga. April 25, 2008) (finding it unreasonable to conclude that service on the "School System" was void when it was obvious to the School District that the summons was directed at the proper entity). As in Dockens, it is clear here that even though this Defendant legally may be the "Tift County School District," the entity frequently refers to itself as "Tift County Schools." See, e.g., Doc. 28-5, p. 8; see also http://www.tiftschools.com. The School District plainly was on notice of the lawsuit and, despite Plaintiff's continued error, has fully participated in litigating the case without any apparent prejudice caused by Plaintiff's improper identification. Defendants' motion to dismiss the School District on this basis is, thus, denied.

**B.     Claims Against Tift County School Board**

Defendants next argue that the Court should dismiss the Tift County School Board because the Board is not a legal entity capable of being sued. Federal Rule of Civil Procedure 17(b)(3) provides that the capacity to sue or be sued for a party that is not an individual or a corporation, such as a school board, shall be determined according to the law of the state where that court is located, which in this case is Georgia. Under Georgia law, "'a county board of education, unlike the school district which it manages, is not a body corporate and does not have the capacity to sue or be sued.'" Mason v. Clayton Cty. Bd. of Educ., 334 Fed. App'x 191, 194 (11th Cir. 2009) (quoting Cook v. Colquitt Cty. Bd. of Educ., 261 Ga. 841 (1992). In contrast, school districts are corporate bodies with the capacity to sue and be sued. Zachery v. Crawford Cty. Bd. of Educ., 2008 WL 4394736, at *2 n. 2 (M.D.Ga. Sept. 24, 2008) (citing Foster v. Cobb Cty. Bd. of Educ., 133 Ga. App. 768 (1975). Thus, the proper party in this case is the Tift County School District, not the Tift County School Board. The Court therefore dismisses Plaintiff's claims against the School Board.

**C.     Official Capacity Claims Against School Board Members**

Defendants also contend that Plaintiff's official capacity claims against the individual School Board members are improper. A plaintiff may bring a suit asserting claims of discrimination against an individual in his official capacity.

See Cross v. Ala. Dep't of Mental Health & Mental Retardation, 49 F.3d 1490, 1504 (11th Cir. 1995); aff'g, Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (holding that Title VII claims may be brought either against the employer directly or by naming the supervisory employees as agents of the employer). However, official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 690 n. 55 (1978)). Naming both the employer and the agents, though, is redundant and adds nothing to the case. See, e.g., Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991) (noting that it is appropriate to dismiss defendants named in their official capacities as "redundant and possibly confusing to the jury"); Willis v. Ga. Dep't of Nat. Res., 2007 WL 2908458, at *7 (M.D.Ga. Sept. 29, 2007) (granting summary judgment to defendants with respect to plaintiff's Title VII claims against the supervisors sued in their official capacities); Williams v. Lowndes Cty., 2006 WL 2443509, at *3 (M.D.Ga. Aug. 21, 2006) (finding it appropriate to dismiss Title VII claims asserted against defendants named in their official capacities "when a plaintiff's employer was already named a defendant because such a construction would be repetitious"). Accordingly, the Court dismisses as redundant Plaintiff's official

capacity claims against Defendants Atwater, Ezekial, Smith, Rutland, Griffin, Richbourg, Roberson, and Hall.

### D.    Race Discrimination

Plaintiff's lawsuit is, in part, premised on allegations that the School District terminated his employment on the basis of his race. According to Plaintiff, who is African American, other similarly situated white employees were not terminated after engaging in substantially parallel conduct. Plaintiff further asserts that the School District held him to different standards and that, ultimately, Plaintiff's race was the motivating factor for his termination.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may establish a prima facie case of discrimination through either direct or circumstantial evidence. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004). Claims of race discrimination premised on circumstantial evidence, as is the present case, are evaluated under the burden-shifting framework developed in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). In order to make out a prima facie case under this framework, the plaintiff first must set forth "facts adequate to permit an inference of discrimination."

16

<u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997). If the plaintiff is able to do so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 256 (1981). The employer "need not persuade the court that it was actually motivated by the proffered reasons." <u>Id.</u> at 254-55. "If the employer satisfies its burden of articulating one or more reasons, then the presumption of discrimination is rebutted, and the burden of production shifts to the plaintiff to offer evidence that the alleged reason of the employer is a pretext for illegal discrimination." <u>Wilson</u>, 376 F.3d at 1087.

### 1.    Prima Facie Case

To establish a prima face case of discriminatory discharge, Plaintiff must produce circumstantial evidence that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class or was replaced by a person outside of his protected class." <u>Thompson v. Tyson Foods, Inc.</u>, 939 F. Supp. 2d 1356, 1364 (M.D. Ga. 2013) (citing <u>Maynard v. Bd. of Regents</u>, 342 F.3d 1281, 1289 (11th Cir. 2003)). "If the plaintiff can make this showing – which is 'not onerous' – the establishment of a prima face case creates a presumption that the employer discriminated against the plaintiff on the basis of race." <u>Flowers v. Troup Cty. School Dist.</u>, 803 F.3d

1327, 1336 (11th Cir. 2015) (quoting Burdine, 450 U.S. at 253-54). Here, it is undisputed that Plaintiff, who is African American, is a member of a protected class; that he met the requisite qualifications as both a school bus driver and a paraprofessional; and that he suffered an adverse employment action. However, Plaintiff's prima facie case for race discrimination fails because Plaintiff has not produced evidence that he was treated less favorably than a similarly situated employee of another race.[7]

To draw a valid comparison, the plaintiff must demonstrate that he and the comparators "are similarly situated in all relevant aspects." Holifield, 115 F.3d at 1562. In the context of disciplinary action, "the quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999). "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holified, 115 F.3d at 1562; see also Rioux v. City of Atlanta, Ga., 520 F.3d 1269, 1281 (11th Cir. 2008) ("The most important factors in a comparator analysis in the disciplinary context are the nature of the offenses committed and the nature of the

---

[7] The individuals who filled Plaintiff's bus driver and paraprofessional positions were both African-American and, thus, fall within Plaintiff's same protected class. (DSOMF ¶¶ 52-53).

punishment imposed."). Summary judgment is appropriate where the plaintiff fails to demonstrate the existence of a similarly situated employee and where there is no other evidence of discrimination. Holifield, 115 F.3d at 1562.

Plaintiff offers three comparators for the Court's consideration: Kristi Pharr, Darlene Turner, and Sherry Hill.[8] According to Plaintiff, Kristi Pharr, a white female who also worked as a bus driver for the School District, drove each morning from Omega, Georgia to conduct her bus route. (Doc. 33). After completing her morning duties, Ms. Pharr then drove her bus to Ty Ty, Georgia, where she worked at the local post office until her afternoon route began. (Doc. 33). Plaintiff further claims that Ms. Pharr used her bus to run personal errands. Plaintiff next avers that Darlene Turner, another a white female bus driver for the School District, drove her bus from Brookfield, Georgia each day and then parked her bus at Citizen Hardware until her afternoon route. (Doc. 33).

Neither Ms. Pharr nor Ms. Turner is an adequate comparator. First, it is undisputed that bus drivers were permitted to drive their buses home in between routes. However, unlike Plaintiff, these women worked for the School District exclusively as bus drivers. They did not serve in a dual capacity as paraprofessionals or in any other role with the School District. So, in contrast to

---

[8] Defendants state that Plaintiff incorrectly identified Sherry Hill. The TCSD never employed an individual by that name. Rather, Defendants show that this person is correctly identified as Beth Hall. (DSOMF ¶ 55; Doc. 28-7, p. 8).

Plaintiff, the School District did not anticipate Ms. Pharr or Ms. Turner to report directly from one job to the other without returning home. Nor is there evidence that the School District specifically asked these individuals not to drive their buses to their secondary places of employment and that they failed to abide by those instructions. More importantly, there is no evidence that Ms. Pharr or Ms. Turner at any time displayed images of a sexual nature to students, as Plaintiff admits doing. Accordingly, the Court finds that Ms. Pharr and Ms. Turner were not similarly situated to Plaintiff in any relevant capacity.

Beth Hall is, likewise, not a proper comparator. Unlike Ms. Pharr and Ms. Turner, Ms. Hall did work for the School District as both a bus driver and as a special education paraprofessional. According to Plaintiff, Ms. Hall was treated more favorably than he because she was permitted to drive her bus home each day. However, the undisputed evidence before the Court demonstrates that Plaintiff, too, was able to drive his bus home at the end of the day; he simply was asked not to return home in the period of time between the end of his morning route and the beginning of his paraprofessional duties. Plaintiff does not suggest that Ms. Hall was able to do so. Nor has Plaintiff presented evidence that Ms. Hall shared inappropriate materials with her students.

Plaintiff has failed to show that he was treated less favorably than similarly situated employees outside his protected class. While the three comparators, like

Plaintiff, each drove a school bus for the TCSD, Plaintiff presents no evidence that any of these individuals either drove their buses home, to work, or on a personal errand after being explicitly instructed not to because the additional trip might interfere with that employee's other work duties with the School District. Nor does Plaintiff offer any evidence that these individuals shared materials of a sexual nature with students. Accordingly, they are not proper comparators, and summary judgment is properly granted.

### 2. Pretext

Even if Plaintiff could establish a prima facie case of discrimination, the Court still finds that Defendants are entitled to summary judgment because Plaintiff cannot show that Defendants' legitimate, nondiscriminatory reason for terminating him was merely a pretext for race discrimination.

The employer has the burden of production, not persuasion to articulate a nondiscriminatory reason for termination, a burden that has been described as "exceedingly light." Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005). To establish that the employer's proffered reason is nothing more than a pretext for discrimination, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision. The plaintiff may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotations and punctuation omitted). Evidence offered to establish the prima facie case may be offered again to establish pretext. Wilson, 376 F.3d at 1088.

A plaintiff may not recharacterize the employer's proffered nondiscriminatory reasons. Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Id. Further, "federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991). The Eleventh Circuit has repeatedly held that an employer may terminate an employee for a good or bad reason without violating federal law. See id.; see also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."); Smith v. Papp Clinic, P.A., 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fires an employee because it honestly believed the employee had violated a company policy, even if it was mistaken in such belief," the discharge does not violate federal law.); Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th

22

Cir. 1984) ("The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason all, as long as its action is not for a discriminatory reason.").

Here, the TCSD has proffered sufficient evidence from which a reasonable jury could determine that the School District had a legitimate, nondiscriminatory reason for ending Plaintiff's employment. The first reason given by the School District is that Plaintiff violated the district's code of conduct for employees when he displayed images of a sexual nature to students without seeking prior approval from the school's administrators. Even though Plaintiff claims that he did not knew that the images were inappropriate, he readily admits to having shared a video about subliminal messages that included sex-based content. The School District secondarily fired Plaintiff for insubordination after failing to abide by the instruction not to return to his home in between his morning bus route and the start of his paraprofessional duties. Because each of these reasons "might motivate a reasonable employer," Chapman, 229 F.3d at 1030, the Court concludes that the TCSD has satisfied its "exceedingly light" burden of producing legitimate, nondiscriminatory reasons for terminating Plaintiff's employment.

The burden now shifts to Plaintiff to produce "significantly probative" evidence showing that these reasons are pretext for discrimination. Young v. Gen. Foods. Corp., 840 F.2d 825, 829 (11th Cir. 1998) (internal quotation

23

omitted). In response to the School District's explanation that Plaintiff was terminated for insubordination, Plaintiff does not question the underlying facts but suggests that based on the School District's failure to punish other similarly situated employees outside of Plaintiff's protected class, the School District's reason is not worthy of credence. Similarly, Plaintiff does not deny that he shared the subliminal messages video clip with the ISS students; rather Plaintiff questions the reasonableness of timeline preceding his termination and the applicability of the particular standard of conduct the School District alleges he violated by showing the images.

Plaintiff first claims that the School District's decision to terminate him based on his habit of driving his school bus home to tend to his farm between his morning route and the start of his paraprofessional duties is unworthy of credence. For many years, Plaintiff indisputably engaged in this same activity without consequence. (PSOMF ¶ 4). However, at the beginning of the 2012-2013 school year, Kevin Dobard instructed Plaintiff that he no longer could return home in between jobs. (DSOMF ¶ 62). Plaintiff links this request to a purported change in the School District's policy regarding personal use of the buses. Facing budget cuts during the 2011-2012 school year, the School District began moving away from permitting bus drivers to take their buses home in an effort to conserve fuel costs. (Doc. 39, pp. 50, 52). According to Plaintiff, while his

24

personal use of his bus was restricted because of this shift in policy, other white bus drivers were permitted to drive their buses great distances between bus routes and were not terminated.

While it is possible that the School District's budget played some role in the decision to require Plaintiff to change his morning routine, the proffered reason for the directive, which Plaintiff fails to address, stems from the School District's concern that Plaintiff continuing to drive home in between jobs would interfere with his paraprofessional responsibilities. When Dobard first contacted Plaintiff regarding the proposed transfer from the physical education paraprofessional position at the elementary school to the ISS paraprofessional position at Northeast, Dobard doubted if Plaintiff could continue as a bus driver. (Doc. 38, pp. 34-35). Because the ISS post was a full-time position, Dobard questioned whether Plaintiff's bus route would conflict with his paraprofessional duties. (Doc. 38, p. 35). The advantage of the transfer, though, was that Plaintiff's morning route ended at Northeast, meaning he could report directly from one job to the other. (DSOMF ¶ 60). Plaintiff discussed the predicament with Principal Haskins, who ultimately agreed that Plaintiff could continue as a school bus driver with the understanding that Plaintiff would begin his paraprofessional duties directly after his morning bus route. (DSOMF ¶¶ 65-66; PSOMF ¶ 2).

Plaintiff does not deny that Dobard told him that he could no longer return to his farm in between jobs. Nor does Plaintiff deny that, for a time, he complied with this order before reverting back to his old ways without discussing the matter with Dobard or Principal Haskins. The School District, therefore, had a legitimate basis for its decision to terminate Plaintiff for insubordination, which Plaintiff has not rebutted. While Plaintiff claims that other white bus drivers were permitted to drive their buses home or to other places of employment between bus routes, Plaintiff offers no evidence that the School District specifically told any of the other drivers to cease driving to these other locals because doing so interfered with their commitment to the School District.

Plaintiff focuses a great deal of his attention on the School District's decision to terminate him for insubordination; however, it is apparent to the Court that the School District's primary reason for ending Plaintiff's employment with the School District evolved from Plaintiff displaying images of a sexual nature to the ISS students. Plaintiff admits that sometime in the beginning of the 2012-2013 school year, he conducted a mini-lesson with the ISS students about subliminal messages after finding obscene images drawn on the walls of the classroom. (DSOMF ¶ 22; PSOMF ¶ 15; Doc. 38, pp. 73, 75-77, 84-85, 94). With the students gathered around his desk, Plaintiff searched the internet for "subliminal messages," thereby retrieving a blog entry that contained a brief

video segment depicting numerous images pulled from Walt Disney animated movies, including women in bikinis and the word "sex" written in the clouds from two separate scenes in *The Lion King* and a purported phallus from *The Little Mermaid*. (DSOMF ¶ 22; PSOMF ¶ 15; Doc. 38, pp. 73-75, 77, 81, 94-96).

The exact date when this lesson on subliminal messages occurred is not evident from the record. Plaintiff suggests that the event took place at some point in August 2012. Because the School District did not approach him about the allegations until November, Plaintiff argues initially that his termination was pretextual because a "reasonable person can determine that the video was not the motivating factor in Plaintiff's termination." (Doc. 32, p. 14). There is no substance and hence no merit to this argument.

Plaintiff next argues that, although he shared the images with the students, the School District should not have terminated him because he had good intentions in conducting this lesson on subliminal messages. Plaintiff also states that he did not know that the images were inappropriate for student viewing and that he was under the impression that, provided the information was being introduced for an educational purpose for the benefit of the students, he did not require preapproval. He further contends that the School District failed to articulate how he violated the subject standard of conduct. Standard 2 of the Standards of Conduct set forth in the Employee Handbook provides, "An

27

educator should always maintain a professional relationship with all students, both in and outside the classroom. Unethical conduct includes but is not limited to . . . soliciting, encouraging, or consummating an inappropriate written, verbal, electronic, or physical relationship with a student." (DSOMF ¶¶ 14-15). In particular, Plaintiff faults Dobard for being unable to articulate the meaning of this standard of conduct and how showing the sexual images amounted to an inappropriate electronic relationship.

Plaintiff's arguments fail to attack the School District's proffered reasons for terminating Plaintiff in any meaningful way. Nor does Plaintiff make any effort to connect his termination for sharing inappropriate content with the ISS students to his race. Instead, Plaintiff attempts to explain his conduct and to quarrel with the School District's reasoning. While Plaintiff may disagree with his termination or believe that it is unfair, provided there is no evidence that the School District was motivated by a prohibited discriminatory reason, it is not the Court's role to reassess the School District's decision or to weigh fairness. Thus, in the absence of any evidence linking Plaintiff's termination to his race, the Court concludes that summary judgment is appropriate as to Plaintiff's claims of race discrimination.

### E.    Age Discrimination

In addition to his claims under Title VII, Plaintiff alleges that the School District's decision to hire Isaac Alford to fill Plaintiff's ISS paraprofessional

position and Sharlene Carter to fill his bus driver position, both of whom were much younger than Plaintiff at the time of his termination, violated his rights under the Age Discrimination in Employment Act ("ADEA"). The ADEA makes it unlawful for an employer to fire an employee over the age of 40 because of his age. 29 U.S.C. § 623(a)(1); Sims v. MVM, Inc., 704 F.3d 1327, 1331-32 (11th Cir. 2013). To prevail in an action under the ADEA, an employee must establish that his age was the "but-for" cause of the adverse employment action. Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176 (2009).  This showing may be made through either direct or circumstantial evidence. Mora v. Jackson Mem'l Found., Inc., 597 F.3d 1201, 1203 (11th Cir. 2010) (per curiam). An ADEA case premised on circumstantial evidence, as is this case, entails application of the McDonnell Douglas framework. See Sims, 704 F.3d at 1332.

Under McDonnell Douglas, the plaintiff first must establish a prima facie case in order to create a presumption of unlawful discrimination. To establish a prima face case of age discrimination, the plaintiff must show: (1) he was a member of the protected group between the age of 40 and 70; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged. Kragor v. Takeda Pharm. Am. Inc., 702 F.3d 1304, 1308 (11th Cir. 2012). Upon setting forth a prima facie case, "the burden

shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." Id. If the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason is a pretext. Id.

The parties do not dispute that Plaintiff is a member of a protected class;[9] that he was terminated; that a substantially younger person filled the position from which he was discharged;[10] or that he was qualified as either a school bus driver or as a paraprofessional. However, the parties disagree that Plaintiff's age was the "but-for" cause of his termination. Given, though, that the legal analysis is the same for both an ADEA claim and a Title VII claim, and noting that the parties have put forth no additional arguments or evidence other than that already examined in the context of Plaintiff's Title VII claims, the Court concludes that it is unnecessary to reanalyze Plaintiff's claims. See Cofield v. Goldkist, Inc., 267 F.3d 1264, 1267 n.6 (11th Cir. 2001). Accordingly, for the same reasons set forth above in relation to Plaintiff's Title VII claims, namely that Plaintiff has failed to identify a proper comparator and to show that the School District's legitimate, nondiscriminatory reasons for terminating Plaintiff were pretextual, Plaintiff's age

---

[9] Plaintiff was 53-years old at the time of his termination. (Doc. 38, p. 7).
[10] A 29-year old male assumed Plaintiff's ISS paraprofessional duties. (DSOMF ¶ 52; PSOMF ¶ 28; Doc. 28-7, p. 7). Plaintiff's bus driving position was filled by a 28-year old female. (DSOMF ¶ 53; Doc. 28-7, p. 7).

discrimination claim fails as a matter of law. Defendants are, therefore, entitled to summary judgment on Plaintiff's ADEA claim.

## IV.    Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 28) is granted, and this case is dismissed with prejudice.

**SO ORDERED**, this the 6th day of January, 2016.


*s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**


aks